**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN T. SHINGARA,** | : | **CIVIL ACTION NO. 1:04-CV-0621** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **KATHY A. SKILES, et al.,** | : | |
| | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

This is a § 1983 action filed by John T. Shingara ("Shingara"), an employee of

the Pennsylvania State Police ("State Police").  Shingara worked in the Technical

Support Division ("TSD") of the State Police from 1992 until 2004, when he was

transferred to another division.  (Doc. 70 ¶ 2; Doc. 76 ¶ 2.)  That transfer, along with

a number of other employment actions taken by the defendants, are the subject of

this lawsuit.  The defendants are Kathy A. Skiles ("Skiles"), Major Wesley R. Waugh

("Waugh"), and Lieutenant Colonel Ralph Periandi ("Periandi").  Skiles is the TSD

Director.  (Doc. 70 ¶ 3; Doc. 76 ¶ 3.)  Waugh is the Director of the Bureau of

Technology Services and Skiles' direct supervisor.  (Doc. 70 ¶ 9; Doc. 76 ¶ 9.)

Periandi is the Deputy Commissioner of Operations for the State Police and is

authorized to give press interviews on behalf of the State Police.  (Doc. 70 ¶¶ 172,

180; Doc. 76 ¶¶ 172, 180.)  In his complaint, Shingara alleges that defendants:

(1) retaliated against him for exercising his First Amendment rights, (2) violated his

Fourteenth Amendment right to due process, (3) conspired against him, and

(4) defamed him.  Presently before the court is the motion for summary judgment

(Doc. 69), filed by defendants.  For the reasons that follow, the motion will be

granted.

I.    **Statement of Facts**[1]

    A.    **Shingara's Responsibilities**

    The primary responsibilities of TSD employees, like Shingara, are to provide

voice communications systems and computer help desk operations for the State

Police.  (Doc. 70 ¶ 4; Doc. 76 ¶ 4.)  TSD is also responsible for assisting the Bureau of

Patrol with its duties regarding radar equipment, and Shingara considered himself

TSD's "radar guy or expert." (Doc. 70 ¶¶ 5-6, 21; Doc. 76 ¶¶ 5-6, 21; Doc. 79, Ex. F at

¶ 15.)  Shingara's duties with respect to radar equipment consumed approximately

---

    [1] In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to Shingara. See infra Part II.  Constructing the facts was rendered more difficult by the absence of record citations throughout Shingara's responsive statement of material facts. (See, e.g., Doc. 76 ¶¶ 20, 29-30, 41, 52, 56, 94, 96, 98); see also L.R. 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.").  Of particular note are Shingara's denials of several facts on the ground that he is without knowledge as to the truthfulness of the statements.  (See, e.g., Doc. 76 ¶¶ 59-60, 63, 90, 97).  While this may be an appropriate response to allegations in a pleading, see FED. R. CIV. P. 8(b), it is insufficient to sustain an objection to factual assertions drawn from competent evidence of record, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986).  Furthermore, many of Shingara's denials challenge not the factual accuracy of the averments but their relevance, a subject suitable for legal arguments, not a Rule 56.1 responsive statement.  (See, e.g., Doc. 76 ¶¶ 60, 63, 97); L.R. 56.1.
    The court has conducted an independent review of the record, but where no evidence supports Shingara's position, the court has accepted defendants' statement as true.  See L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."); see also infra Part II.

10 to 20% of his time.  (Doc. 70 ¶ 26; Doc. 76 ¶ 26; Doc. 79, Ex. F at ¶ 18.)  Specifically, Shingara was responsible for:  (1) visiting radar calibration laboratories to ensure their compliance with State Police guidelines, and (2) evaluating radar equipment for purchase by the State Police.  (Doc. 70 ¶ 25; Doc. 76 ¶ 25.)

> **B.**    **Shingara's Testimony Concerning Radar Equipment**

On September 2, 2003, Shingara notified his immediate supervisor, Mark Wrightstone ("Wrightstone"), that he had been subpoenaed to testify in a criminal proceeding in the Cumberland County Court of Common Pleas regarding a potential radar equipment malfunction.  (Doc. 70 ¶ 66; Doc. 76 ¶ 66.)  In May 2003, Waugh had become aware of this alleged equipment problem; he was advised that certain radar equipment used by the State Police had issued phantom readings when not in use.  (Doc. 70 ¶ 32; Doc. 76 ¶ 32.)  A team was established to examine the allegations.  The team was headed by representatives of the Bureau of Patrol, with Shingara providing technical assistance from TSD.  (Doc. 70 ¶ 34; Doc. 76 ¶ 34.)  The team proposed various options to correct the alleged problem.  (Doc. 70 ¶ 42; Doc. 76 ¶ 42.)  Patrol Captain Michael Marcantino ("Marcantino") was not convinced, however, that the phantom readings had any effect on the proper functioning of the radar equipment.  (Doc. 70 ¶ 43.)  As a result, Marcantino hired an independent laboratory to conduct a further investigation.  This investigation

was in progress at the time Shingara was subpoenaed to provide testimony.[2]
(Doc. 70 ¶¶ 45-47.)

When Waugh learned of Shingara's subpoena, Waugh became concerned that Shingara's testimony could reveal State Police work-product that was incomplete and confidential, and that Shingara was a maverick employee, attempting to establish himself as a "radar expert for personal gain." (Doc. 70 ¶ 67; Doc. 72, Ex. B at ¶ 12; Doc. 79, Ex. C at 183.) Waugh's concerns arose because: (1) Shingara was subpoenaed at home rather than at work, and (2) Shingara was selected by defense counsel as the state police expert witness despite the fact that the radar investigation was being headed by other representatives of the Bureau of Patrol. (Doc. 70 ¶ 67.) Accordingly, Waugh directed Skiles and Wrightstone to attend the trial to observe Shingara's testimony. (Doc. 70 ¶ 67.) Waugh also directed Skiles to review State Police policies regarding the release of confidential information with Shingara and to inform Shingara that he was not the designated public relations representative for radar issues. (Doc. 70 ¶¶ 71, 77; Doc. 76 ¶¶ 71, 77.) Shingara admits that he received these instructions but feels that they were

---

[2] According to defendants, the investigation ultimately revealed that the phantom readings did not affect the proper functioning of the radar equipment. (Doc. 70 ¶¶ 45-47.) However, Shingara stands firm in his belief that the proper functioning of the radar equipment was compromised and that the defendants attempted to cover up any false radar readings that resulted. (Doc. 79, Ex. F at ¶ 16.)

designed to coerce him into silence, rather than to inform him about State Police policies.  (Doc. 79, Ex. F at ¶¶ 3, 21.)

On September 4, 2003, Shingara provided testimony regarding the potential radar malfunction.  (Doc. 70 ¶ 73; Doc. 76 ¶ 73.)  Defendants acknowledge that Shingara's testimony was truthful.  (Doc. 70 ¶ 74.)  Nevertheless, after Shingara testified Skiles told him that he could be fired for his testimony.[3]  (Doc. 79, Ex. F at ¶ 6.)  Thereafter, Waugh instructed Skiles to initiate an investigation to determine if Shingara had violated any State Police rules or regulations as a result of  his testimony.  (Doc. 70 ¶ 79; Doc. 76 ¶ 79.)  The investigation concluded that disciplinary action against Shingara was not warranted. (Doc. 70 ¶ 82; Doc. 76 ¶ 82.)

Also following Shingara's testimony, Periandi provided a twenty-minute interview to the Philadelphia Daily News concerning the radar issue.  (Doc. 70 ¶ 181; Doc. 76 ¶ 181.)  Periandi stated that if Shingara testified that the radar units were giving false readings, Shingara was mistaken.  (Doc. 70 ¶ 181; Doc. 76 ¶ 181.) Shingara also asserts that Periandi described him as a "disgruntled employee," but Shingara is unable to identify the source of that information.  (Doc. 70 ¶ 184; Doc. 76 ¶ 181, 184.)

C.    **Transfer of Radar Functions to the Bureau of Patrol**

During the course of the investigation into the phantom readings and prior to Shingara's testimony, Marcantino grew increasingly concerned that the separation

---

[3] Skiles denies threatening Shingara's employment.  (Doc. 70 ¶ 75.)

of radar functions between TSD and the Bureau of Patrol hampered the ability of the State Police to identify and resolve radar issues.  (Doc. 70 ¶ 56; Doc. 72, Ex. F at ¶ 7.)  On June 4, 2003 and November 6, 2003, Marcantino met with Skiles to discuss transferring all radar functions to the Bureau of Patrol.  (Doc. 70 ¶ 60; Doc. 72, Ex. F at ¶¶ 9, 13-14; Doc. 72, Ex. A at ¶ 33.)  Effective January 1, 2004, all radar duties were transferred to the Bureau of Patrol, with TSD providing technical assistance when required.  (Doc. 70 ¶¶ 61-65; Doc. 76 ¶¶ 61-62, 64-65.)

        **D.**      **Shingara's Alleged Racist Comment**

In late September 2003, Waugh learned that Shingara had made the following statement:  "We just had an incident involving two Negroes in a Jeep.  We can use the word Negroes, because it was a Negro that reported the incident."  (Doc. 70 ¶ 100.)  Waugh felt that the statement had "a racial undertone and was inappropriate."  (Doc. 70 ¶ 100.)  Shingara admits to making the statement, but denies that the statement was inappropriate.  (Doc. 76 ¶ 100.)  On November 3, 2003, Shingara was given an oral reprimand for this statement.  (Doc. 70 ¶ 101; Doc. 76 ¶ 101.)

        **E.**      **Shingara's Anonymous Letter**

On October 28, 2003, an anonymous letter was faxed to State Police headquarters.  (Doc. 70 ¶ 102; Doc. 76 ¶ 102.)  The letter criticized Skiles' management of TSD and alleged that Skiles discriminated against men.  The letter

also suggested that several employees had left TSD because of Skiles.[4]  (Doc. 70

¶ 102; Doc. 76 ¶ 102.)  The State Police conducted an investigation into the

anonymous letter and determined that it had been sent by Shingara.  (Doc. 70

¶¶ 105- 106; Doc. 76 ¶¶ 105-106.)  Eventually, Shingara admitted that he had sent the

letter as a "well planned" strategy to prompt an investigation of TSD.  (Doc. 70

¶¶ 110, 126; Doc. 76 ¶¶ 110, 126.)

---

[4] The full text of the letter is as follows:

Please excuse the anonymity of this message but here at Technical [S]ervices
Division the walls have ears and the repercussions of this message would be
detrimental to our employment.

Next month when the Governor's hiring freeze is lifted, at leave five TSD
employees will be leaving for positions at other agencies.  We know you are
aware that this is a repetitive and costly pattern in this division.  We
understand at least twenty five people have transferred from TSD because of
the Director.  When are you going to stand up and take action?  We would
like to stay here and earn our salary as professionals but the Director makes
it impossible.  Her constant self promotion and lack of technical
understanding has become an embarrassment to the Division and the
Department.  Every person at TSD has been seriously demoralized because
of her sexual preference and micro management.  The Director has turned us
all into perfect State Workers with a Perfect State mentality.  Everybody in
the Department know [sic] this, TSD has become a joke.

If you truly believe in the PSP mission or vision statement, you would take
the time to interview each member of the TSD in confidence.  We understand
this is an unpleasant undertaking but something must be done.  We are
looking to you for a resolution.  It is very hard to respect upper management
when we know you know what we go through every day.   There is no doubt
in our mind, once you have all the facts, you will see that action must be
taken.

(Doc. 70 ¶ 102; Doc. 76 ¶ 102.)

As a component of the investigation, a number of Shingara's coworkers were interviewed to determine if they agreed with the allegations contained in the letter. While many disagreed, some acknowledged that they agreed with the content of the letter, at least in part.  (Doc. 70 ¶¶ 110-123, 128-129; Doc. 76 ¶¶ 110-123, 128-129.) Waugh received the final report from the investigation on February 20, 2004. (Doc. 70 ¶ 133; Doc. 76 ¶ 133.)  The investigation concluded that the letter contained inaccurate information and amounted to a "malicious attempt to undermine Skiles' position as a supervisor."  (Doc. 70 ¶ 134.)  The investigation also concluded that Shingara's statements adversely affected TSD operations and imperiled the harmony of the working environment.  (Doc. 70 ¶ 135.)

On March 1, 2004, a pre-disciplinary conference was held and the results of the investigation were discussed with Shingara.  (Doc. 70 ¶ 141; Doc. 76 ¶ 141.)  On March 5, 2004, Waugh recommended that Shingara be disciplined.  (Doc. 70 ¶ 142; Doc. 76 ¶ 142.)  In April 2004, Shingara was suspended from work for thirty days. (Doc. 70 ¶ 147; Doc. 76 ¶ 147.)  When Shingara returned from his suspension on

June 3, 2004, he was reassigned to the Strategic Development Division ("SDD").[5]

(Doc. 70 ¶ 152; Doc. 76 ¶ 152.)

### F.   Shingara's New Position in SDD

When Shingara was first assigned to SDD, his initial responsibilities were to oversee and conduct an inventory of computer equipment owned by the State Police.  (Doc. 70 ¶¶ 160-161; Doc. 76 ¶¶ 160-161.)  The inventory of computer equipment was part of a larger program to upgrade State Police computer systems and to install a wireless computer network in all State Police vehicles.  (Doc. 70 ¶ 157; Doc. 76 ¶ 157.)  As part of this program, Shingara was sent to a Motorola A+ computer training school.  He is currently the only State Police employee with both radio and Motorola A+ computer training.  (Doc. 70 ¶¶ 162-163; Doc. 76 ¶¶ 162-163.) Thereafter, Shingara worked with his SDD supervisor to create a new job description that would match his unique skills.  (Doc. 70 ¶ 167; Doc. 76 ¶ 167.) Shingara currently provides technical support for both radio and computer-related issues and oversees the installation of computer equipment in State Police vehicles.

---

[5] Shingara asserts that on June 3, 2004, Waugh sent two police officers to the home of Shingara's son "to question and intimidate him."  (Doc. 76 ¶¶ 84, 152.) However, these assertions were not included in Shingara's amended complaint filed on December 10, 2004.  (See Doc. 39.)  Accordingly, any claim that this act was retaliatory has been waived because it was raised for the first time at summary judgment.  Protocol Electronics, Inc. v. Transolutions, Inc., No. Civ. 03-4162, 2005 WL 1106132, at *5 (D.N.J. Apr. 29, 2005) ("[I]t is impermissible, without leave of court, to raise new claims for the first time on summary judgment."); see also Krouse v. Amer. Sterilizer Co., 126 F.3d 494, 499 (3d Cir. 1997).

(Doc. 70 ¶¶ 169-170; Doc. 76 ¶¶ 169-170.)  He describes his new position as what he has "always wanted."  (Doc. 70 ¶ 167; Doc. 76 ¶ 167.)

According to Shingara, the decision to transfer him to SDD was a "great management decision" because he could no longer work with Skiles.  (Doc. 70 ¶ 152; Doc. 76 ¶ 152.)  Moreover, it is undisputed that the reassignment preserved Shingara's rank and rate of pay and removed him from a position that was likely to become obsolete due to changes in the industry.  (Doc. 70 ¶¶ 154, 165; Doc. 76 ¶ 165.)

G.   **Procedural History**

On March 23, 2004, Shingara filed the instant action pursuant to 42 U.S.C. § 1983.  (See Doc. 1.)  On December 10, 2004, Shingara filed an amended complaint. (See Doc. 39.)  In his amended complaint, Shingara contends that defendants: (1) retaliated against him for exercising his First Amendment rights, (2) violated his Fourteenth Amendment right to due process, and (3) conspired against him. Shingara also contends that Periandi defamed him.[6]  (See Doc. 39.)  Defendants filed the instant motion for summary judgment (Doc. 69), alleging that Shingara has failed to establish any of the claims he raises.  The motion has been fully briefed and is ripe for disposition.

---

[6] Shingara acknowledges that neither Skiles nor Waugh made any defamatory statements about him.  (Doc. 70 ¶¶ 76, 86; Doc. 76 ¶¶ 76, 86.)

II.   **Standard of Review**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact," and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  It places the burden on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

III.   **Discussion**

Section 1983 of Title 42 of the United States Code offers private citizens a means to redress violations of federal law committed by state officials.  See 42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Id. Section 1983 is not a source of substantive rights, but merely a method for vindicating violations of other federal laws. Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To establish a claim under this section, the plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Shingara's complaint includes two distinct § 1983 claims: retaliation in violation of the First Amendment and deprivation of due process rights in violation of the Fourteenth Amendment. Shingara's complaint also includes pendent state claims of civil conspiracy and defamation. The court will address each of these claims *seriatim*.

## A.   Retaliation[7]

The First Amendment "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 126 S. Ct. 1951, 1957 (2006). To state a prima facie claim of retaliation, a public employee must allege that: (1) the activity in question is protected by the First Amendment, (2) the defendants' acts were retaliatory, and (3) the protected

---

[7] As a threshold matter, Shingara has failed to allege that Periandi was personally involved in any of the allegedly retaliatory actions. (Doc. 70 ¶¶ 173-179; Doc. 76 ¶¶ 173-179); see also Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) ("A[n individual] defendant in a civil rights action must have personal involvement in the alleged wrongdoing . . . ."). Therefore, the court will grant summary judgment in favor of Periandi on Shingara's retaliation claims.

activity was a "substantial motivating factor" of the alleged retaliation.  Hill v.

Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006); see also Chambers v.

Pennsylvania, Civ. A. No. 1:04-CV-0714, 2006 WL 3831377, at *7 (M.D. Pa. Dec. 28,

2006); Baldassare, 250 F.3d at 195.  A defendant can rebut a prima facie case of

retaliation by showing that "the same adverse action would have taken place in the

absence of the protected conduct."  Chambers, 2006 WL 3831377, at *7; see also

Baldassare v. New Jersey, 250 F.3d 188, 194 (3d Cir. 2001).  Whether the activity is

protected is a question of law, while the remaining inquiries are questions of fact.

Hill, 455 F.3d at 241.

### 1.    Protected Activity

A public employee's statement is a protected activity if: (1) the employee

spoke as a citizen about a matter of public concern, and (2) the government

employer did not have "an adequate justification for treating the employee

differently from any other member of the general public' as a result of the

statement he made."  Id. (quoting Garcetti, 126 S. Ct. at 1958).

### a.    Public Concern

A public employee's speech involves a matter of public concern if "it can be

fairly considered as relating to any matter of political, social or other concern to the

community."  Hill, 455 F.3d at 243 n.25.  In determining if speech is a matter of

public concern, the court must consider the "content, form, and context of a given

statement, as revealed by the whole record."  Connick v. Myers, 461 U.S. 138, 147-48

(1983).  Speech generally involves a matter of public concern if it "attempts to bring

to light actual or potential wrongdoing or breach of public trust on the part of government officials." <u>Baldassare</u>, 250 F.3d at 195.

In the matter *sub judice*, Shingara alleges that he spoke as citizen about a matter of public concern by:  (1) testifying in Cumberland County Court, and (2) filing this lawsuit.[8]  Defendants concede that providing testimony at a hearing and filing a federal complaint are both matters of public concern.[9]  (Doc. 71 at 5 n.2.)

### b.   Balancing of Interests

To determine whether defendants had adequate justification for treating Shingara differently from a member of the general public, the court must balance "the interests of the employee . . . in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." <u>Barry v. Luzerne County</u>, 447 F. Supp. 2d 438, 445 (M.D. Pa. 2006).  When the employee speaks in a public forum, the

---

[8] To the extent that Shingara now alleges that the anonymous letter is protected speech, that claim has been waived because it was raised for the first time at summary judgment.  <u>Protocol</u>, 2005 WL 1106132, at *5 ("[I]t is impermissible, without leave of court, to raise new claims for the first time on summary judgment."); <u>see also</u> <u>Krouse</u>, 126 F.3d at 499.  In fact, Shingara's amended complaint fails to even mention the anonymous letter.  (<u>See</u> Doc. 39.)  Even in the absence of this clear waiver, the court finds persuasive defendants' argument that the anonymous letter was not protected speech; rather, Shingara was speaking as an employee, and not as a citizen, when he wrote the letter.  <u>See</u> <u>Garcetti</u>, 126 S. Ct. at 1960 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes.").

[9] Filing a federal complaint qualifies as petitioning the government and is, therefore, protected so long as the complaint is not frivolous.  <u>Brennan v. Norton</u>, 350 F.3d 399, 417 (3d Cir. 2003).

court must consider not only the employee's interest in the speech but also "the public's interest in access to the information." Id. at 446.  If the balance weighs in favor of the employer, the speech is unprotected.  Ober v. Evanko, 80 F. App'x 196, 200 (3d Cir. 2003).

In determining the government's interest, the court should consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, . . . impedes the performance of the speaker's duties, or interferes with the regular operation of the enterprise." Barry, 447 F. Supp. 2d at 445-46.  Law enforcement agencies are generally given "wide latitude to regulate an employee's speech when that speech impacts on areas such as discipline, morale, harmony, uniformity, and trust in the ranks." Ober, 80 F. App'x at 201.  In weighing the extent of the detrimental impact on a close working relationship, the "proximity within the organizational hierarchy between the employer and the employee is particularly important." Muti v. Schmidt, 118 F. App'x 646, 648 (3d Cir. 2004)

In the instant case, defendants argue that Shingara's testimony is unprotected speech because Shingara's interest in testifying is outweighed by the interest of the State Police "in determining whether employees have leaked confidential work product . . . which could wrongly affect the disposition of pending criminal cases in the Commonwealth."  (Doc. 71 at 8 n.5.)  On Shingara's side is the public's strong interest in uncovering wrongdoing by public officials, such as police

officers.  Muti, 118 F. App'x at 648.  On the defendant's side is the strong interest of

the State Police in regulating employee speech that could have a detrimental

impact on efficient law enforcement.  See Barry, 447 F. Supp. 2d at 445-46.  What

tips the balance in Shingara's favor is the fact that his disclosure of the radar

information was involuntary because he was subpoenaed to testify.  See Grigsby v.

Kane, No. 1:CV-99-2083, 2005 WL 348305, at *11 (M.D. Pa. Feb. 9, 2005) (citing

voluntariness of disclosure as a factor in the balancing of interests).  Therefore, the

court finds that Shingara's testimony constituted protected speech.[10]

### 2.    Retaliatory Action

Shingara alleges that the following acts were done in retaliation for his

protected speech:  (1) the transfer of radar functions from TSD to the Bureau of

Patrol, (2) Waugh's investigation into Shingara's subpoena, (3) Waugh's verbal

reprimand for Shingara's allegedly racist statement, (4) Waugh's decision to

suspend Shingara for thirty days, (5) Waugh's decision to transfer Shingara to a

new position in SDD, (6) Skiles' statement that Shingara could be fired, and

---

[10] Defendants do not argue that application of the balancing test makes
Shingara's complaint unprotected speech.  (See Doc. 71.)  In any event, the court
finds that Shingara's complaint constitutes protected speech.

(7) Waugh's instructions and Skiles' instructions that Shingara was not to divulge information regarding the radar issue.[11]

To qualify as retaliatory, an employer's conduct must adversely affect an employee's First Amendment rights. Brennan, 350 F.3d at 419; see also Breiner v. Litwhiler, 245 F. Supp. 2d 614, 632-33 (M.D. Pa. 2003) (holding that conduct must be sufficient "to deter a person of ordinary firmness from engaging in the First Amendment-protected activity" in order to qualify as retaliatory). Determining whether a plaintiff's First Amendment rights were adversely affected is a "fact intensive inquiry focusing on the status of the speaker, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." Brennan, 350 F.3d at 419. Retaliatory acts must be "more than *de minimis* or trivial" to adversely affect an employee's First Amendment rights. Id. Decisions relating to "promotion, transfer, recall and hiring" are significant enough to qualify as retaliatory, while "criticism, false accusations, or verbal reprimands" are not. Id.

Otherwise trivial incidents "may be actionable through their cumulative impact . . . even though the actions would be *de minimis* if considered in isolation." McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006). In certain circumstances, a public

---

[11] Shingara also alleges that Waugh and Skiles attempted to cover up false radar readings in retaliation for his protected speech. However, Shingara has adduced no evidence that the alleged cover-up actually occurred. To the contrary, Shingara admits that he is aware of no evidence to suggest that any erroneous citations were ever issued because of false radar readings. (Doc. 70 ¶¶ 48-49, 51; Doc. 76 ¶¶ 48-49, 51.) Accordingly, Shingara has failed to meet his burden of proof with respect to this allegation. See supra Part II; Pappas, 331 F. Supp. 2d at 315.

employee may bring a cause of action alleging that his or her First Amendment rights were violated by a pattern of retaliatory harassment "even if he or she cannot prove that the alleged retaliation adversely affected the terms of his or her employment." Id. at 169. This rule "is premised on the idea that being the victim of petty harassments in the workplace . . . is in itself retaliation." Id. at 170; see also Suppan v. Dadonna, 203 F.3d 228, 234-35 (3d Cir. 2000) (holding that where an employee was subjected to threatening statements for more than a year before receiving low rankings on a promotion eligibility evaluation, the employee had established a First Amendment claim based on retaliatory harassment). However, "not every critical comment—or series of comments— made by an employer to an employee" provides a basis for a First Amendment violation. McKee, 436 F.3d at 170 (holding that occasional admonishments "for straying from the scope" of an assigned task did not constitute retaliatory harassment sufficient to establish a First Amendment claim).

In the action *sub judice*, the transfer of radar functions from TSD to the Bureau of Patrol had no apparent adverse effect on Shingara. See supra Part I-C; Suppan, 203 F.3d at 235 ("Section 1983 is a tort statute. A tort to be actionable requires injury.") Likewise, the investigation into the circumstances of Shingara's subpoena had no adverse effect on Shingara. In fact, the investigation exonerated Shingara of any wrongdoing in connection with his testimony. See supra Part I-B. Therefore, a reasonable jury could not find that these allegations constituted retaliatory action.

Indeed, the only allegations of adverse action are Shingara's verbal reprimand in September 2003, his thirty-day suspension in April 2004, and his transfer in June 2004.  See Brennan, 350 F.3d at 419.  As a matter of law, the verbal reprimand is insufficient to constitute retaliatory action.  Id.; see also supra Part I-D.  With respect to the transfer, Shingara admits that he has not suffered any actual injury.  See Suppan, 203 F.3d at 235  (observing that § 1983 is a tort statute and requires actual injury).   In fact, Shingara describes the new position as what he has "always wanted" and touts the transfer as a "great management decision" because he could no longer work with Skiles after writing the anonymous letter.  (Doc. 70 ¶¶ 152, 167; Doc. 76 ¶¶ 152, 167.)  Therefore, a reasonable jury could not find that Shingara's transfer constituted a retaliatory action.  In contrast, the court finds that Shingara's thirty-day suspension obviously constitutes adverse action.[12]

Shingara's remaining allegations are too trivial to constitute retaliatory action.[13]  Shingara received isolated verbal instructions regarding the radar issue from Skiles and Waugh.  In addition, Shingara was allegedly advised by Skiles, after

---

[12] Shingara's claim of retaliation based upon this disciplinary action fails for reasons that will be addressed in the next section.  See infra Part III-A-3.

[13] Shingara has made no attempt to clearly articulate a claim that these allegations, although trivial in isolation, constitute retaliatory harassment in gross. (See Docs. 39, 77.)  Nevertheless, the court finds that the cumulative effect of these events simply would not "deter a person of ordinary firmness from engaging in a First Amendment-protected activity."  Breiner, 245 F. Supp. 2d at 632-33.  At most, Shingara received "occasional admonishments" regarding his job performance, which is insufficient to establish a campaign of retaliatory harassment.  McKee, 436 F.3d at 170 (holding that occasional verbal reprimands did not constitute retaliatory harassment sufficient to establish a First Amendment claim).

he testified, that his testimony might jeopardize his employment.  Placed in context, Skiles' post-hearing comment to Shingara was undoubtedly a *post facto* observation, not a veiled threat.  In any event, Skiles' comment was not part of a pattern of veiled threats or harassment.  At most, these ineffectual communications are equivalent to oral reprimands, which do not rise to the level of actionability under the First Amendment.  See Brennan, 350 F.3d at 419.  The court finds that a reasonable jury could not conclude that such isolated communications constituted retaliatory action.

### 3. Causation

Turning to the final element of the prima facie case, the only alleged retaliatory act that need be addressed  is Shingara's thirty-day suspension.  To establish the causation element of a retaliation claim, a plaintiff must prove that the exercise of his First Amendment rights "played some substantial role" in motivating the retaliatory act.  Meenan v. Harrison, Civ. A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D. Pa. Apr. 13, 2006).  However, a plaintiff need not prove that the retaliation was "motivated solely or even primarily by the protected activity."  Id.  If a plaintiff meets this burden, the defendant can rebut the claim of causation by showing that "the same adverse action would have taken place in the absence of the protected conduct."  Chambers, 2006 WL 3831377, at *7; see also Baldassare, 250 F.3d at 194.  The temporal proximity of a retaliatory act to a plaintiff's exercise of his First Amendment rights is probative of the causation element of a retaliation claim.  Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003).

Shingara asserts that he was suspended for thirty days in retaliation for his testimony and for filing this lawsuit.  Defendants assert that Shingara was suspended because his anonymous letter was determined to be an "inappropriate attempt to undermine the supervision of TSD."  (Doc. 71 at 10.)  On its face, the letter is clearly intended to foment discontent and stir up criticism of Skiles and TSD management.  Thus, the anonymous letter provides a rational basis for the suspension.  Shingara has not produced any evidence sufficient to rebut defendants' proffered non-retaliatory reason for Shingara's suspension.  As defendants properly observe, the thirty-day suspension occurred much closer in time to the investigation into Shingara's anonymous letter than to his testimony.  See Estate of Smith, 318 F.3d at 512.  In addition, Shingara learned that he was going to be disciplined at a pre-disciplinary conference held on March 1, 2004, more than three weeks before this lawsuit was filed.  (Doc. 70 ¶¶ 140-141; Doc. 76 ¶¶ 140-141.)  The court finds no evidence which would tend to demonstrate that the disciplinary reasons for Shingara's suspension are pretextual.  Accordingly, a reasonable jury could not conclude that Shingara's suspension was prompted by his protected speech.

In sum, the court finds that, although Shingara engaged in protected speech, he has failed to establish that any of the actions taken by the defendants were in retaliation for that speech.  Accordingly, the court will grant summary judgment on Shingara's retaliation claim.

**B.**   <u>**Due Process**</u>

Shingara alleges that defendants violated his rights to procedural and substantive due process by transferring him out of his area of expertise and away from his friends and associates and by destroying his ability to engage in his chosen profession.  (<u>See</u> Doc. 39 ¶ 28.)  Defendants seek dismissal of Shingara's due process claims on grounds that he has not alleged the deprivation of an interest that is entitled to due process protection.

In response, Shingara fails to offer any argument to support his procedural due process claim.  Accordingly, the court concludes that Shingara has abandoned this claim.  <u>See</u> <u>D'Angio v. Borough of Nescopeck</u>, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999) (noting that abandonment of a position is tantamount to waiver); <u>see also</u> L.R. 7.6.  In regards to his substantive due process claim, Shingara alleges for the first time in his brief in opposition that the claim is founded upon defendant Waugh's alleged decision to send two police officers to the home of Shingara's son on June 3, 2004.  However, any claims based on this alleged incident have been

waived because they were raised for the first time at the summary judgment stage.[14]

Accordingly, the court will grant defendants' motion for summary judgment with

respect to Shingara's due process claims.

## C.    Civil Conspiracy

Shingara's amended complaint alleges that defendants:

> unlawfully cooperated and acted together for (1) the unlawful purpose of
> distorting facts of profound public concern in an attempt to avoid admitting
> publicly that citizens have been written erroneous traffic citations due to this
> faulty equipment and (2) discrediting the plaintiff as a way to achieve their
> cover-up of faulty traffic citations.

(Doc. 39 at 2.)  Pennsylvania law[15] dictates that "agents of a single entity cannot

conspire among themselves."  Lackner v. Glosser, 892 A.2d 21, 35 (Pa. Super. Ct.

2006).  All defendants in the instant action are agents of the State Police; therefore,

---

[14] See supra note 5.  Even if Shingara had not abandoned the claim, he has
failed to allege facts sufficient to constitute a violation of his substantive due
process rights.  The Due Process Clause protects against deprivations of "life,
liberty, or property."  U.S. CONST. amend. XIV, § 1.  The threshold issue of due
process analysis is whether the plaintiff has been deprived of one of these
protected interests.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 316 (M.D. Pa. 2004).
Shingara alleges that his liberty interest in family relations was interfered with
when Waugh allegedly sent two police officers to his son's home.  (Doc. 77 at 7-8.)
To implicate due process protection, the government's actions must take the form
of "intrusive regulation of the family," such as prohibiting family members from
living together.  See Moore v. City of E. Cleveland, 431 U.S. 494, 498 (1977).  The
court finds that Waugh's actions in this case do not constitute "intrusive regulation"
of Shingara's family and, therefore, do not implicate Shingara's substantive due
process rights.

[15] None of the parties dispute the applicability of Pennsylvania law to
Shingara's state law claims.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79-80
(1938); see also Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 613 (3d Cir. 1992)
(noting that federal courts sitting in diversity must apply the substantive law of the
state of the forum state).

they cannot be liable for civil conspiracy.  Accordingly, defendants' motion for summary judgment will be granted with respect to Shingara's civil conspiracy claim.

### D.   **Defamation**

Shingara alleges that Periandi defamed him by referring to him as a "disgruntled employee" and by indicating that "he was incompetent and unskilled" and that "he was lying, and had created, or otherwise intentionally fabricated, [his testimony] as a way to vent his unhappiness."  (Doc. 39 ¶ 26.)  Under Pennsylvania law, a claim of defamation requires the plaintiff to establish, *inter alia*, the defamatory nature of the communication, publication of the communication by the defendant, the communication's application to the plaintiff, and special harm to the plaintiff resulting from the publication.  42 PA. CONS. STAT. ANN. § 8343(a); see also Zugarek v. S. Tioga Sch. Dist., 214 F. Supp. 2d 468, 480 (M.D. Pa. 2002).  The defamatory nature of a particular statement is a question of law for the court.  Id.

Measured against this standard, Shingara's allegations fall short.  As a threshold matter, the court finds no evidence to suggest that Periandi actually made any of the statements set forth above.  (See Doc. 70 ¶ 184; Doc. 76 ¶ 181, 184.) Periandi did state that Shingara was "mistaken" if he testified that the radar units were giving false readings; however, this statement simply is not defamatory in character.  (Doc. 70 ¶ 181; Doc. 76 ¶ 181); see also Maier v. Maretti, 671 A.2d 701, 704 (Pa. Super. Ct. 1995) ("In determining whether [a] communication is defamatory, the court must consider the effect the statement would fairly produce, or the

impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.").  Although Periandi's statement may have been embarrassing to Shingara, the statement would not have had such an extreme impact on Shingara's reputation as to "lower him in the estimation of the community" or to "affect his fitness for the proper conduct of his . . . trade or profession."  Id. ("[C]ommunications which may annoy or embarrass a person are not sufficient as a matter of law to create an action in defamation.").

Furthermore, Shingara admits that he did not personally hear any of Periandi's alleged defamatory statements, e.g. that "he was lying", and Shingara cannot identify anyone who heard the alleged statements.[16]  (Doc. 70 ¶ 184; Doc. 76 ¶ 184.)  By Shingara's own admission, he is unable to prove an essential element of his defamation claim – publication of the alleged defamatory statements.  Zugarek, 214 F. Supp. 2d at 480.  Accordingly, the court will grant defendants' motion for summary judgment with respect to Shingara's defamation claim.

---

[16] Despite this admission, Shingara alleges without any record support, that he believes that Periandi made the statements.  (Doc. 70 ¶ 183; Doc. 76 ¶ 183.)  This bare allegation is insufficient to rebut defendants' factual assertions, which are drawn from competent evidence of record.  See L.R. 56.1 ("Statements of material facts . . . in opposition to a motion shall include references to parts of the record that support the statements.  All material facts set forth in the [moving party's statement] will be deemed to be admitted unless controverted by the [nonmoving party's statement].");  Anderson, 477 U.S. at 256-57 (1986) (holding that a plaintiff must "present affirmative evidence in order to defeat a properly supported motion for summary judgment"); see also supra note 1.

**IV.**   **Conclusion**

For the foregoing reasons, the court will grant defendants' motion for

summary judgment, and this case will be closed.

An appropriate order will issue.


    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:        January 24, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN T. SHINGARA,** | : | **CIVIL ACTION NO. 1:04-CV-0621** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **KATHY A. SKILES, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 24th day of January, 2007, upon consideration of the motion for summary judgment (Doc. 69), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1.  Defendants' motion for summary judgment (Doc. 69) is GRANTED.

2.  The Clerk of Court is directed to enter JUDGMENT against plaintiff and in favor of defendants Kathy A. Skiles, Wesley R. Waugh, and Ralph Periandi.

3.  The Clerk of Court is directed to CLOSE this case.



   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge